UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FLETCHER QUILLER,

                                    Plaintiff,

            - against -                                    **OPINION AND ORDER**

OFFICER DANIEL NUNEZ, Shield No. 18750,            16 Civ. 3202 (ER)

                                    Defendant.

Ramos, D.J.:

        Fletcher Quiller ("Quiller") alleges that, following a traffic stop, he was

wrongfully searched, arrested, and prosecuted for the possession of a knife and

marihuana, both of which were ultimately suppressed.  In connection with these events,

Quiller filed suit, pursuant to 42 U.S.C. § 1983, against Police Officer Daniel Nunez

("Nunez") and others, for an illegal search, false arrest, malicious prosecution, violation

of his right to a fair trial, and municipal liability under the Fourth, Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution.[1]  Pending before this Court

are the parties' cross-motions for summary judgment.  For the reasons set forth below,

Nunez's motion is denied as to the unlawful stop, the unlawful search and the fair trial

claims, and granted as to all other claims, and Quiller's motion is denied in full.

## I.      Factual Background and Procedural History

        This case hinges on the circumstances of Quiller's arrest and prosecution

following a traffic stop.  Many of the facts are hotly contested, including the predicate for

---

[1] The parties subsequently stipulated to dismissal of the municipal liability claim and all but Nunez as a
defendant.

the stop, Nunez's observations immediately preceding the subsequent search, and items recovered by Nunez during that search, but the following account is undisputed.[2]

On April 30, 2013, Quiller was the sole passenger in a cab traveling from New Jersey to New York.  At approximately 2 p.m., Nunez and two other officers pulled the cab over.  Nunez ordered Quiller and the driver out of the vehicle.  Nunez frisked Quiller, finding a knife shaped like a motorcycle that Nunez believed to be a gravity knife,[3] while another officer patted the driver down.  An additional knife that Nunez believed to be a switchblade,[4] and a small bag of marihuana were recovered during the stop.  Nunez arrested both Quiller and the driver, and transported them to the 47th Precinct where the driver was released without being charged.  Quiller, however, was arraigned on two counts of fourth-degree criminal possession of a weapon[5] and unlawful possession of marihuana,[6] and released on bail.[7]  Prior to a suppression hearing held in connection with

_____

[2] These facts are taken from the parties' 56.1 statements and counterstatements unless otherwise noted.

[3] A gravity knife "has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device."  N.Y. Penal Law § 265.00(5).

[4] A switchblade has "a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife."  N.Y. Penal Law § 265.00(4).

[5] At the time, criminal possession of a weapon in the fourth degree was a misdemeanor prohibiting possession of, *inter alia*, switchblades and gravity knives.  N.Y. Penal Law § 265.01(1) (eff. Mar. 16, 2013); William C. Donnino, *Gravity Knife*, Supplementary Practice Commentary to N.Y. Penal Law § 265.01 (noting possession of gravity knives is no longer prohibited by the statute).

[6] At the time, unlawful possession of marihuana was a violation-level offense prohibiting knowing and unlawful possession of marihuana.  N.Y. Penal Law § 221.05 (eff. 1977); William C. Donnino, *Decriminalization of Two Ounces or Less of Marihuana*, Supplementary Practice Commentaries to N.Y. Penal Law § 221.00 (explaining that, effective August 28, 2019, unlawful possession of marihuana "was renamed 'unlawful possession of marihuana in the second degree,' and the authorized sentence of a fine was downgraded to not more than $50.").

[7] Quiller was simultaneously arraigned for an incident that occurred while he was in Bronx Central Booking awaiting arraignment on this case.  Quiller was accused of grabbing the buttocks of a correction officer and rearrested for third-degree assault and forcible touching.  Doc. 28-2 at 151:9-18; *Quiller v. New York*, No. 16 Civ. 3205 (RJS), 2018 WL 3418777, at *2 (S.D.N.Y. July 13, 2018).  The incident resolved with Quiller pleading to disorderly conduct on June 14, 2016.  *Id.*  In connection with the incident, Quiller

the prosecution, one weapon possession count related to the switchblade was dismissed. On February 7, 2014, Nunez testified at the suppression hearing that, in addition to the motorcycle knife, he recovered the additional knife and small bag of marihuana from Quiller during the stop.  Following the hearing, at which only Nunez testified, the court suppressed the remaining knife and marijuana, as well as a statement Quiller made while in custody.  On March 27, 2014, the charges against Quiller were dismissed upon the prosecution's motion.  This lawsuit followed.

On April 29, 2016, Quiller brought suit against the City of New York, Nunez, and three other police officers pursuant to 42 U.S.C. § 1983 for unlawful search, false arrest, malicious prosecution, denial of a fair trial, and *Monell* liability under the Fourth, Fifth, Sixth, and Fourteenth Amendments.  Quiller gave his account of events for the first time at his October 22, 2019 deposition and, on October 25, 2019, Nunez was also deposed. Shortly thereafter, on October 31, 2019, the parties stipulated to narrow the case, dismissing Quiller's *Monell* liability claim and claims against all defendants but Nunez.

Nunez and Quiller have now cross-moved for summary judgment on all claims. Their accounts of the traffic stop widely diverge, as detailed below.

### A.      Nunez's Account

Nunez first provided his version of the events surrounding the stop in the sworn criminal complaint initiating the case against Quiller, and then at the suppression hearing, both of which differ in key respects.  He also gave deposition testimony in connection with this case in which he testified, essentially, that he did not remember the stop.

---

sued correction officers alleging excessive force and denial of the right to a fair trial.  *Id.*  The fair trial claim was dismissed on summary judgment, and the excessive force claim was ultimately rejected by a jury.  *Id.* at *5; Docket No. 16 Civ. 3205 at Doc. 80.

i.     **The Criminal Complaint[8]**

On April 30, 2013, the date of the stop, Nunez swore that he observed a switchblade knife clipped to Quiller's pants pocket.  Doc. 32-4 at 1.  Nunez identified the knife as a switchblade because it had "a blade that is released from the handle by application of hand pressure applied to a spring, lever or other device on the handle."  *Id.*  Nunez stated that he discovered an additional knife inside of Quiller's pants pocket and identified that knife as a gravity knife "based on his training and experience."  Doc. 32-4 at 1.  Nunez averred that he "tested" the gravity knife, which had "a blade that was released from the handle by use of centrifugal force."  *Id.*  In addition, Nunez asserted that he found a ziplock bag of "a dried, green leafy substance with a distinctive odor" which he believed to be marihuana.  *Id.* at 1-2.  Finally, he noted that Quiller had told him, in sum and substance, "the knives are mine."  *Id.* at 1.

ii.     **The Suppression Hearing**

At the suppression hearing on February 7, 2014, Nunez testified that, at approximately 2:05 p.m. on April 30, 2013, while patrolling with two partners in the Bronx, New York, he observed a vehicle that was being driven erratically and whose driver had committed a traffic infraction by either disobeying a traffic device or failing to signal.[9]  *Id.* at 14:7-25, 22:15-19, 25:12-14.  According to Nunez, the car was "stopping [and] it was going."  *Id.* at 14:22.  Nunez, along with his partners, pulled the vehicle over "just to see what was going on."  *Id.* at 14:17-25.  Nunez approached the passenger side

---

[8] The complaint does not mention anything about the traffic stop.  Doc. 32-4.

[9] His memobook notes reflect that the car was pulled over for a failure to signal.  Doc. 27-2 at 2.

and smelled marihuana from the open passenger side window.[10]  Doc. 27-3 at 15:4-6, 15:11-17, 26:1-10.  The officers ordered Quiller and the driver out of the car and frisked both men for the officers' safety.  *Id.* at 15:18-21.

In contrast to his account in the complaint, Nunez testified that, "at that point in time I observed a *gravity knife* . . . clipped to" Quiller's right pocket, not a switchblade. *Id.* at 15:18-16:5 (emphasis added); Doc. 32-4 at 1.  And, in contrast to that earlier testimony at the same hearing, Nunez later testified that he had seen the gravity knife in Quiller's pocket when Quiller was sitting down, not when Quiller was outside of the car. Doc. 27-3 at 29:1-12.

When asked why he believed the knife was a gravity knife, Nunez responded that "there was metal sticking up from above the pocket."  *Id.* at 33:1-7.  When asked again why he believed it was a gravity knife, Nunez added, "I removed it from his pocket, I observed it, I opened it[11] and it was indeed a knife."  *Id.* at 33:11-15.

Nunez continued frisking Quiller, discovering an additional knife in his pocket and a small bag of marihuana.  *Id.* at 16:8-13.  The officers arrested both men and transported them back to the 47th Precinct.  *Id.* at 16:22-17:4.  They arrested the driver

---

[10] Although Nunez's memobook entry does not reflect that he smelled marihuana, there is a notation for "CPM."  Docs. 27-2 at 2; 27-3 at 26:11-15.  In his counterstatement to Quiller's 56.1 statement, Nunez asserts that CPM refers to unlawful possession of marihuana.  Doc. 34 at ¶ 13; N.Y. Penal Law § 221.05 (eff. 1977).

[11] Nunez's testimony does not specify how he opened the knife.  However, in the video dated January 28, 2018 submitted in support of his summary judgment motion, he performed the "wrist flick test" which measures whether the knife opens by the force of gravity and locks into place.  *Cracco v. Vance*, 376 F. Supp. 3d 304, 306 (S.D.N.Y. 2019).  This test has come under scrutiny, however, because regular pocket knives can become openable this way over time.  *Id.* at 307-08.  In *Cracco v. Vance*, Judge Crotty found the gravity knife definition unconstitutionally vague as applied where police had taken up to five tries to open plaintiff's knife and emphasized the "high risk of arbitrary and discriminatory enforcement."  *Id.* at 313, 316-18.  On May 30, 2019, New York removed gravity knives from the statute.  William C. Donnino, *Gravity Knife*, Supplementary Practice Commentary to N.Y. Penal Law § 265.01.  In Nunez's video submission, the gravity knife had been taped shut.  Once the tape was removed, Nunez touched the blunt edge of the blade twice and, after five wrist flicks, the knife opened.  Doc. 28-4 at 1:28:20-32.  On his second attempt, it took three wrist flicks to open the knife.  *Id.* at 1:28:57-29:01.

because Nunez, finding it odd that Quiller was carrying two knives, did not know who owned them and believed they might have passed the knives between themselves.  *Id.* at 17:5-12.  Nunez also wanted to confirm the car was properly used by the driver because it was not registered to him.  *Id.* at 17:24-18:8.  On the way back to the 47th Precinct, Quiller spontaneously told Nunez that both knives and the marihuana were his.  *Id.* at 17:16-23, 19:1-6.

Following his testimony, the remaining knife, the marihuana, and Quiller's statement were suppressed.  The court held that the predicate for the stop was insufficiently established because Nunez had been unable to recall why he had stopped the car and therefore suppressed all fruits.  *Id.* at 51:10-24.  The court also stated, "I'm not sure if the People established [Nunez's] ability to determine it was a gravity knife." *Id.* at 52:2-4.

### iii.    Nunez's Deposition Testimony

At his deposition on October 25, 2019, Nunez could not recall why he stopped the car, what happened after the car was stopped, or anything Quiller had said.  Doc. 27-1 at 37:8-12, 39:16-23, 41:3-8, 42:8-22, 46:6-14.  He had no recollection of whether he had seen anything in Quiller's pockets when Quiller was seated in or standing outside of the car, what Quiller was wearing, or if he had smelled marihuana from the car.  *Id.* at 44:21-45:7, 55:12-22.  He had no memory of recovering a knife from either passenger in the car or why the driver was let go.  *Id.* at 47:5-13, 54:19-23.

Nunez disclaimed receiving any special training to identify gravity knives or switchblades beyond learning their definitions in the Penal Law.  *Id.* at 47:21-49:9.  He

had no recollection of if he had ever made an arrest for either type of knife before arresting Quiller.  *Id.* at 49:22-50:25.

      **B.**     **Quiller's Account**

      Quiller disputes much of Nunez's account at his own deposition, and via affidavit in support of his summary judgment motion.

      **i.**     **Quiller's Deposition Testimony**

      At his deposition on October 22, 2019, Quiller testified that, at around 10 a.m. on April 30, 2013, a taxi picked him up in New Jersey.  Doc. 28-1 at 95:4-22, 98:4-6.  He sat in the front passenger seat and was wearing a sweatsuit.  *Id.* at 96:22-23, 98:25-99:3. Quiller had several shopping bags with him which contained approximately 10 knives that he had recently purchased.  *Id.* at 99:4-12, 100:2-3.  When they arrived at Quiller's home in Yonkers, New York, Quiller asked the driver to wait, brought in his bags, and selected two knives, one of which he gave to the driver as a tip.  *Id.* at 54:13-15, 104:3-10.  The knife he gave to the driver was black and had a clip.  *Id.* at 104:11-18.  He kept the other knife, which was silver and shaped like a motorcycle, in his own pocket.  *Id.* at 105:4-8.

      Quiller then directed the driver to his second stop, an impound lot where he needed to check on a car.  *Id.* at 106:14-22.  The cab stopped "hundreds" of times on the way to the lot.  *Id.* at 109:3-6.  While on their way, Quiller poked his head out of the passenger side window to ask police, who were in plainclothes but had pulled over another driver, a question.  *Id.* at 106:25-07:15; Doc. 28-2 at 144:2-7.  When Quiller realized that they were from New York City and not Mt. Vernon, he stated "oh you're not from Mt. Vernon."  Doc. 28-1 at 106:25-07:15.

Immediately afterwards, as the same officers pulled the cab over, Quiller was facing forward and did not hear any sirens or directions from the police, or see any lights indicating that they should pull over.  Doc. 28-2 at 146:12-23.  Quiller did not know why they were being pulled over.  *Id.* at 146:18-23.   The driver told Quiller that he had his signal on.  Doc. 28-1 at 107:16-18.

Without any warning, police opened the doors of the car, told the men to get out of the vehicle, frisked them, and found a knife on each of them.  *Id.* at 107:16-25, 115:6-10.  Quiller told the officer that he had given the knife recovered from the driver to him.  *Id.* at 116:20-22.  According to Quiller, there was no marihuana recovered at the scene of the stop.  *Id.* at 148:10-15.  He denied that he or the driver had smoked any marihuana in the car.  *Id.* at 102:18-20, 103:19-04:2, 105:18-20.  Quiller only found out at arraignment that he was accused of possessing marihuana.  Doc. 28-2 at 147:23-48:1, 10-15.

While out on bail, Quiller had to return for fifteen to twenty court appearances "off of this one case."  *Id.* at 167:1-7.  He was arrested for a violation of the conditions of his bail, namely missing at least one court date, remanded from on or about June 20 to July 26, 2013, and was held at the Manhattan Detention Complex from August 2013 until September 16, 2013.  *Id.* at 166:1-69:13; Doc. 39 at ¶ 75.

### iii.    Quiller's Affidavit

In his affidavit in support of his summary judgment motion, Quiller averred to several additional details about the traffic stop for the first time, most of which merely supplement his earlier accounts.  By affidavit, Quiller asserted that he both saw and heard the signal indicator in the car immediately preceding the traffic stop.  Doc. 31-6 at ¶ 4.

He also denied that the motorcycle knife was visible from his pocket, or that he could smell marihuana in the car.  Doc. 31-6 at ¶¶ 8, 13.

However, for the first time in his summary judgment papers, Quiller also averred that he was prosecuted through the suppression hearing for the knife that he has always maintained was in the driver's possession.  In his complaint, Quiller alleged that he was charged with possession of both knives but that the count related to the driver's knife was dismissed because it was determined not to be a gravity knife,[12] and made clear that the motorcycle knife was the subject of his continued prosecution.  Doc. 1 at ¶¶ 18-19.  By contrast, in his affidavit, Quiller claimed for the first time that the charge related to the motorcycle knife was thrown out because it "was determined by the DA to be a legal knife" and that his prosecution through suppression was based on the knife the driver had possessed.  Doc. 31-6 at ¶ 15; *see also* Doc. 30 at 2-3 (arguing that "prosecution of the case centered on the military style knife that was in possession of" the driver).  Because this allegation was raised only at this late stage, and contradicts his prior pleadings, this Court declines to consider it.  *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (explaining the sham issue of fact doctrine "prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony"); *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) (noting courts need not consider allegations made for the first time in opposition to summary judgment); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99 Civ. 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("Plaintiffs cannot survive a

---

[12] Though Quiller pleaded that the other knife was determined not to be a gravity knife, the suppression record is clear that the charge related to the other knife was actually dismissed for not qualifying as a switchblade.  Doc. 27-3 at 8:4-12.

summary judgment motion by contradicting their own pleadings in an effort to raise a genuine issue of fact.").[13]

## II.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is initially responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted). However, in opposing a motion for summary

---

[13] Quiller also disputes that the car was driven erratically in his counterstatement to Nunez's 56.1 statement, but he does not cite to nor submit any sworn statement or other evidence contradicting Nunez's observation. Docs. 39 at ¶ 18; 40 at 3-4. This is not enough to establish an issue of fact. Fed. R. Civ. P. 56(c)(1).

judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." (citation omitted)). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Id.*

Here, Nunez argues that Quiller did not raise an unlawful stop claim in his complaint but, if he had, it should be rejected because police had reasonable suspicion or probable cause. Nunez further contends that the search was based on reasonable suspicion or probable cause, that the false arrest and malicious prosecution claims are precluded by the existence of probable cause, and that the denial of his fair trial claim is foreclosed by the lack of a post-arraignment liberty deprivation or favorable termination. Doc. 25. In the alternative, Nunez asserts that he is entitled to qualified immunity where applicable. *Id.* Quiller opposes Nunez's motion, and asserts he is entitled to summary judgment on all of his claims. Docs. 29, 38.

### III.     Discussion

Section 1983 permits citizens to recover damages for violation of their constitutional rights by officers acting under the color of state law.  *Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020).  Here, Quiller alleges that he was unlawfully searched, arrested, prosecuted and denied his right to a fair trial.

Nunez disputes these claims and argues that, even if true, he is entitled to qualified immunity.  Qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted).  Qualified immunity requires a two-step analysis:  "first, whether the plaintiff established that his constitutional rights were violated, and second, whether the right at issue was 'clearly established' at the time of the alleged violation."  *Lennox v. Miller*, --- F.3d ---, 2020 WL 4342247, at *3 (2d Cir. July 29, 2020) (citing *Bacon v. Phelps*, 961 F.3d 533, 542 (2d Cir. 2020).  An officer is entitled to qualified immunity at this stage only if

> he adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citation omitted).  With these guiding principles in mind, the Court analyzes each claim in turn.

### A.    Unlawful Stop[14]

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. U.S.*, 517 U.S. 806, 810 (1996) (citations omitted).  Probable cause is assessed from "the totality of the circumstances" and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citation omitted).  Police may also stop a vehicle when there is "reasonable suspicion that 'criminal activity may be afoot.'" *Navarette v. California*, 572 U.S. 393, 401 (2014) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  Reasonable suspicion is a lesser standard than probable cause and requires looking at the totality of the circumstances surrounding the stop to see whether police had a "particularized and objective basis for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted); *see also Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) ("Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.") (citation omitted).

Preliminarily, Quiller argues for limiting the evidence the Court may consider in adjudicating this claim.  Quiller asserts that Nunez's testimony at suppression is

---

[14] It is true that, prior to his summary judgment motion, Quiller did not characterize his claims as including an unlawful stop.  Docs. 1 at ¶¶ 1, 30-33; 25 at 6; 30 at 5.  However, the lawfulness of the traffic stop is so integral to the claims raised by Quiller that Nunez begins his own summary judgment argument by addressing it.  Docs. 1 at ¶¶ 17, 19; 25 at 6.  Moreover, even if Quiller's claims cannot be fairly construed to include an unlawful stop claim, the Court may consider his arguments as an amendment to the complaint.  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110-13 (2d Cir. 2001) (reversing denial of motion to amend filed following defendant's filing of a summary judgment motion because proposed claim raised genuine issues of material fact).

inadmissible because it differs from his deposition testimony that he does not remember the circumstances surrounding the stop, which occurred over six years prior.  Docs. 27-1 at 37:8-12; 38 at 4-5.  But, unlike the cases upon which Quiller relies, Quiller points to no factual inconsistencies between Nunez's testimony at the suppression hearing and the deposition besides the memory lapse that would reasonably be expected to occur over six years after a traffic stop.  *See, e.g.*, *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 649, 658 (S.D.N.Y. 2000) (finding police testimony raised a question of fact because he gave affirmatively different testimony regarding defendant's description at trial and at his deposition); *Yanez v. City of New York*, 29 F. Supp. 2d 100, 103, 108 (E.D.N.Y. 1998) (finding "troubling" memory lapse of police witness who was involved in a serious accident where his colleagues sustained injuries and there was substantial property damage).  To the extent Quiller is arguing that Nunez's memory lapse is feigned and therefore impacts his credibility, that issue cannot be resolved on summary judgment. *Green v. Town of East Haven*, 952 F.3d 394, 406 (2d Cir. 2020) ("Credibility determinations, the weighing of the evidence . . . are jury functions, not those of a judge ruling on a motion for summary judgment") (citing *Anderson*, 477 U.S. at 255).

Turning to the evidence, Nunez testified at the suppression hearing that he observed the car driving erratically by alternately stopping and going, and committing a traffic infraction, though he could not remember what kind.  Doc. 27-3 at 14:17-25, 22:15-19.  In addition, his memobook reflects that the driver had failed to signal.  Doc. 27-2 at 2.  In support of his summary judgment motion, Quiller submits an affidavit averring that he both saw the signal indicator and heard it.[15]  Doc. 31-6 at ¶ 4.  Though

---

[15] Nunez argues that Quiller's affidavit contradicts his deposition testimony that he was "looking forward" and did not "see anything" or "hear anything."  Docs. 28-2 at 146:18-23; 34 at ¶ 4; 35 at 4.  However, that

Quiller disputes that the car was driven erratically, he does not submit any sworn statement or other evidence contradicting Nunez's account.  Docs. 39 at ¶ 18; 40 at 3-4.  But, while erratic driving *supports* a finding of reasonable suspicion, it is accompanied by other specific circumstances to *amount* to reasonable suspicion.  *See, e.g., Navarette*, 572 U.S. at 402-03 (finding reasonable suspicion where a car ran another off the road because "erratic behaviors are strongly correlated with drunk driving"); *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975) (listing "erratic driving or obvious attempts to evade officers" as circumstances that can support reasonable suspicion, but not passing on its sufficiency alone); *U.S. v. Winkfield*, No. 16 Cr. 98 (ALC), 2016 WL 4190415, at *8 (S.D.N.Y. Aug. 1, 2016) (finding erratic driving, including speeding, swerving, and accelerating to avoid police, gave rise to reasonable suspicion of reckless driving infraction).  Here, any additional circumstances that might support a finding of reasonable suspicion are in dispute.  There is thus a genuine issue of fact as to whether Nunez had reasonable suspicion to stop the cab.

For the same reason, Nunez is also not entitled to qualified immunity.  *Harper v. Town of Newburgh*, No. 18 Civ. 2647 (PED), 2020 WL 1140858, at *8 (S.D.N.Y. Mar. 6, 2020) (finding "disputes as to the facts preclude qualified immunity" where police had "vague" memory of a traffic stop and the record was otherwise devoid of uncontested facts establishing the requisite reasonable suspicion).

Thus, both motions are denied with respect to the unlawful stop.

---

testimony responded to specific questions concerning whether he had heard police sirens or warnings, or seen police lights as they pulled the car over, not whether the driver had properly signaled.

### B.     Unlawful Search

During a lawful traffic stop, a driver and any passengers may be ordered out of a vehicle.  *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (citing *Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) and *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). Police may perform a protective pat down of an individual who exited a vehicle pursuant to a lawful stop if the officer reasonably suspects the person is armed and dangerous. *Johnson*, 555 U.S. at 326 (citing *Terry*, 392 U.S. at 27).  In other words, to perform a frisk, "the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."  *Id.*

Because there is a genuine issue of material fact as to whether Nunez had reasonable suspicion to believe a traffic infraction had occurred, *see supra* Part III.A., he cannot establish that he was justified in ordering Quiller and the driver out of the car.

There is also an issue of fact with respect to whether Nunez then had reason to suspect Quiller was armed and dangerous to support the search.  Nunez testified that he smelled marihuana and then ordered the men out of the car to frisk them for the officers' safety.  Doc. 27-3 at 15:11-21.  Nunez also testified that he saw what he believed to be a gravity knife clipped to Quiller's pocket.  *Id.* at 15:18-16:5.  Quiller denied that he or the driver had smoked marihuana, or that he had marihuana on his person.  Doc. 28-1 at 102:18-20, 103:19-04:2, 105:18-20.  Quiller also denied that the knife was visible from his pocket because he was wearing a sweatsuit and it was in the pocket closest to the door.  *Id.* at 96:22-23; Docs. 31-6 at ¶ 8; 39 at ¶ 31.  There is thus a triable issue of fact as to whether there was reasonable suspicion to believe Quiller was armed and dangerous and a reasonable jury could conclude that Quiller's right to be free of unreasonable search

was clearly violated.  *Bey v. Iaquinto*, No. 12 Civ. 5875 (JCF), 2015 WL 3385706, at *1,

9 (S.D.N.Y. May 26, 2015) (rejecting qualified immunity because plaintiff disputed

police testimony that he had adjusted his pants as though he had a gun, etc.).

 Both Nunez's and Quiller's motions for summary judgment as to the unlawful

search claim are therefore denied.

 **C.** **False Arrest**

 False arrest has the same elements as false imprisonment under New York law.

*Bryant v. Crowe*, 697 F. Supp. 2d 482, 487 (S.D.N.Y. 2010) (noting the Second Circuit

analyzes false arrest claims under the law of the state where an arrest was made).  False

arrest requires that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff

was conscious of the confinement, (3) the plaintiff did not consent to confinement, and

(4) the confinement was not otherwise privileged."  *Id.* (citations omitted).  An arrest

based on probable cause is privileged.  *Harris v. Gittens*, No. 20 Civ. 1306 (CM), 2020

WL 1435005, at *2 (S.D.N.Y. Mar. 20, 2020).  Probable cause can be based on mistaken

information as long as police acted reasonably on the basis of that information.  *Mercedes

v. City of Yonkers*, No. 16 Civ. 6413 (CM), 2019 WL 1369463, at *3 (S.D.N.Y. Mar. 25,

2019) (citing *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994)).  Police only need probable

cause with respect to one offense.  *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d

Cir. 2012).  Summary judgment is appropriate on the issue of probable cause if "there is

no dispute as to the pertinent events and knowledge of the officers."  *Maron v. Cnty. of

Albany*, 166 F. App'x 540, 542 (2d Cir. 2006) (citing *Weyant v. Okst*, 101 F. 3d 845, 852

(2d Cir. 1996).

Nunez is right that irrespective of the validity of the initial stop and search, he had probable cause to arrest Quiller. *Corso v. City of New York*, No. 17 Civ. 6096 (NRB), 2018 WL 4538899, at *7 (S.D.N.Y. Sept. 20, 2018) ("'the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant'") (citing *Townes v. New York*, 176 F.3d 138, 149 (2d Cir. 1999)); *Miller v. City of New York*, No. 11 Civ. 6663 (JSR), 2012 WL 2524248, at *4 (S.D.N.Y. June 26, 2012) ("Miller cites no case in which a court held that a prosecutor's inability to use tainted evidence of a crime at trial means that an officer may not rely on such evidence when making an arrest."). Quiller testified that neither he nor the driver smoked marihuana in the car, and that he did not have marihuana in his possession that day. Doc. 28-1 at 102:14-17, 103:22-04:2. Quiller also disputes that the knife he possessed was at all visible, that it was a gravity knife, or that Nunez had the requisite skill to even identify it as a gravity knife. Doc. 39 at ¶¶ 31, 39. But, none of these circumstances, even if true, negate that Nunez found a knife on Quiller that Quiller admits to possessing and that Nunez was able to open like a gravity knife.[16] Docs. 27-3 at 15:18-16:5; 28-4 at 1:28:20-32, 1:28:57-29:01; *see also supra* n.11.

Even if the motorcycle-shaped knife was ultimately determined not to be a gravity knife and therefore its possession was not an offense, that Nunez could open it by wrist flick suggests Nunez was at least reasonable in believing he had probable cause to arrest. Thus, Nunez is entitled to qualified immunity. *Merring v. Town of Tuxedo, N.Y.*, No. 07 Civ. 10381 (CS), 2019 WL 849752, at *2, 11 (S.D.N.Y. Mar. 31, 2009) (finding, where parties "vigorously" disputed whether officer could operate the knife recovered from

---

[16] Though Nunez's testimony does not specify how he opened the knife at the scene, he did state that he opened it during the stop, and he performed the wrist flick test in his video submission. Docs. 27-3 at 33:11-15; 32-4 at 1; 28-4.

plaintiff as a gravity knife, officer's ability to flick knife open using his wrist was enough to support qualified immunity).

Accordingly, Nunez's motion is granted as to Quiller's false arrest claim.

### D.      Malicious Prosecution

Under § 1983, a claim of malicious prosecution requires plaintiff to show "'(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice.'" *Ramos v. City of New York*, No. 18 Civ. 4938 (ALC), 2020 WL 4041448, at *5 (S.D.N.Y. July 16, 2020) (citing *Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003)).  In addition, plaintiffs alleging malicious prosecution must allege a "perversion of proper legal procedures[,]" which is satisfied where there is a "post-arraignment deprivation of liberty constitut[ing an] unlawful seizure." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 343 (S.D.N.Y. 2009).  Just as probable cause is a complete defense to a claim of false arrest, continuing probable cause is a complete defense to a claim of malicious prosecution. *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014).  Continuing probable cause is probable cause that "is not later nullified by information establishing the defendant's innocence." *Id.* (citation omitted).

Nunez concedes that he commenced the prosecution by filing the criminal complaint against Quiller.  Docs. 25 at 17; 32-4.  The remaining elements, all of which are disputed, are addressed in turn.

19

i.      **Favorable Termination**

Nunez argues that the criminal case against Quiller did not end in his favor because suppression of the evidence against him is not consistent with innocence.  Doc. 25 at 19-22.  For this argument, Nunez relies primarily on the Second Circuit's decision in *Lanning v. City of Glen Falls* affirming that, for malicious prosecution cases brought under § 1983,[17] "proceedings are terminated in favor of the accused only when their final disposition . . . indicate[s] the accused is not guilty."  908 F.3d 19, 26 (2d Cir. 2018) (citing *Singleton v. City of New York*, 632 F.2d 185, 193-95 (2d Cir. 1980)).  The *Lanning* Court concluded that "affirmative indications of innocence" are required and noted that courts must examine "the totality of the circumstances."  *Id.* at 25, 28. *See also Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2019 WL 4450685, at *4 (S.D.N.Y. Sept. 16, 2019) ("No single type of disposition is necessary or sufficient, but the termination must be 'measured in objective terms by examining the totality of the circumstances.'") (citing *Lanning*, 908 F.3d at 28).

Here, Quiller was charged with two counts of criminal possession of a weapon in the fourth degree and one count of unlawful possession of marihuana.  Doc. 32-4.  At the suppression hearing, the court explained that "the People dismissed one count of the weapon [possession] and that was because the switchblade was found not to be a switchblade."  Doc. 27-3 at 8:4-12.  Because the additional knife was determined not to be a switchblade, this disposition is an explicit affirmation of Quiller's innocence of the offense charged.

---

[17] Quiller does not challenge that his malicious prosecution claim was brought pursuant to federal, rather than state, law.  *Lanning*, 908 F.3d at 28 (finding "we are not bound to apply New York law to malicious prosecution claims arising under § 1983" as opposed to claims under New York Law).

Dismissal of the other possession counts following suppression, however, is not on its face indicative of innocence.  Docs. 27-3 at 52:22-24; 32-5.  At the hearing, the court specifically suppressed the remaining evidence because the prosecution had not "establish[ed] the legality of the initial stop" and not for lack of witness credibility.  Doc. 27-3 at 51:10-52:24.  While the record shows that the case was dismissed on the prosecution's motion, neither party makes clear what its basis was, which may be dispositive.  Doc. 32-5.  "'In general, the question of whether a termination was favorable to the accused is a matter of law for the court, but where questions remain as to the *reason* for the termination, this becomes an issue of fact for the jury.'"  *Thompson v. Clark*, 364 F. Supp. 3d 178, 195 (E.D.N.Y. 2019) (quoting *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 413-14 (S.D.N.Y. 2018) (emphasis added).

Had the prosecution, upon moving for dismissal of the charges argued that the evidence of guilt was legally insufficient, "a jury could easily find . . . the explanation given by . . .[the] District Attorney's Office for dropping that charge affirmatively admits [plaintiff's] entitlement to prevail."  *McKenzie v. City of New York*, No. 17 Civ. 4899 (PAE), 2019 WL 3288267, at *15 (S.D.N.Y. July 22, 2019).  "After all, a lack of sufficient evidence in a criminal case entitles a defendant, as a matter of law, to a judgment of acquittal."  *Id.* at 15.  Dismissal for lack of evidence of guilt can be "tantamount to an admission that [plaintiff] was innocent of the charged offenses."  *Mortimer v. Wilson*, No. 15 Civ. 7186 (KPF), 2020 WL 3791892, at *11 (S.D.N.Y. July 7, 2020); *Virgil v. City of New York*, No. 17 Civ. 5100 (PKC) (SMG), 2019 WL 4736982, at *7 (E.D.N.Y. Sept. 27, 2019) ("the Court finds that post-*Lanning*, a dismissal based on the state's express inability to prove its case beyond a reasonable doubt is sufficient to

show a favorable termination for a § 1983 malicious prosecution claim."); *see also Boyd v. City of New York*, 336 F.3d 72, 75, 77 (2d Cir. 2003) (dismissal of charges after suppression of statements constitutes favorable termination).  Notably, the only evidence left of Quiller's guilt following suppression was Nunez's testimony.

There is thus a genuine issue of fact as to whether this disposition was favorable to Quiller.

### ii.    Post-Arraignment Liberty Deprivation

Courts have routinely held that required attendance in court in relation to criminal charges is a post-arraignment deprivation of liberty**.**  *Swartz v. Insogna,* 704 F.3d 105, 112 (2d Cir. 2013) (collecting cases).  Nunez posits that Quiller cannot show a deprivation of liberty interest because he was simultaneously appearing in court on two separate criminal matters through the disposition of this case.  Docs. 25 at 22; 35 at 9 n.1.  While "[i]t is the plaintiff's burden to show that the deprivation of liberty was the result of the allegedly malicious prosecution, and not some other charge that is supported by probable cause[,]" at this stage Quiller has met his burden.  *Mortimer*, 2020 WL 3791892, at *13 (citing *Coleman v. City of New York*, 688 F. App'x 56, 58 (2d Cir. 2017) (summary order)).  Quiller specifically testified that he was required to attend fifteen to twenty court appearances "off of this one case[.]"  Doc. 28-2 at 165:1-7.  *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000) (finding at least five appearances constituted post-deprivation liberty interest at pleading stage); *Williams v. Johnson*, No. 17 Civ. 2351 (ER), 2019 WL 1437820, at *7 (S.D.N.Y. Mar. 31, 2019) (denying defendant summary judgment on malicious prosecution claim where plaintiff had to appear in court four times).  Nunez provides no contrary evidence that Quiller did

not appear on this one case that many times or that each such occasion he was also appearing to answer to another charge. To the extent Nunez challenges the veracity of Quiller's testimony, that is a genuine issue of fact not resolvable on summary judgment.[18]

### iii.    Probable Cause, Malice, and Qualified Immunity

A dispute as to the existence of probable cause begets a dispute of fact with respect to malice. *Boyd*, 336 F.3d at 78 (citing *Ricciuti v New York City Transit Auth.*, 124 F. 3d 123, 131 (2d Cir. 1997) ("Once we find an issue of material fact as to probable cause, the element of malice also becomes an issue of material fact as well."). However, there was probable cause to arrest here. *See supra* Part III.C. And, in the alternative, for the same reasons that Nunez was entitled to qualified immunity on Quiller's false arrest claim, he is entitled to qualified immunity on his malicious prosecution claim. *Id*. *Betts*, 751 F.3d at 83 (finding qualified immunity for, *inter alia*, false arrest and malicious prosecution rests on arguable probable cause).

Thus, Nunez is entitled to summary judgment on Quiller's malicious prosecution claim.

### E.    Denial of the Right to a Fair Trial

Quiller's claim that he was denied the right to a fair trial based on his prosecution for the knife the driver possessed and marihuana he never had is essentially one of fabricated evidence. Docs. 1 at ¶ 37; 30 at 11; 38 at 16-17. Such a claim requires showing that an investigating officer gave fabricated information that was likely to sway the jury to the prosecution and that the plaintiff suffered a deprivation of life, liberty, or

---

[18] Quiller further argues, and Nunez disputes, that his bail revocation was a foreseeable consequence of his malicious prosecution. Docs. 30 at 15; 35 at 11-12. Foreseeability is also "'more suitably entrusted to fact finder adjudication.'" *Guerrero v. Revans*, No. 14 Civ. 8035 (VSB), 2020 WL 878960, at *2 (S.D.N.Y. Feb. 24, 2020) (citing *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007)).

property as a result.  *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir.

2016) (citation omitted).  Unlike false arrest and malicious prosecution claims, probable

cause is not a defense to denial of the trial right.  *Id.* at 278.  Qualified immunity also

does not apply to such a claim.  *Case v. City of New York*, 408 F. Supp. 3d 313, 325

(S.D.N.Y. 2019) (citing *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015)).

Nunez argues that, in addition to these elements, favorable termination is required

following *McDonough v. Smith*, 139 S. Ct. 2149 (2019).  Doc. 25 at 23-24.  In

*McDonough*, the Supreme Court held that the time for bringing a fair trial claim accrues

from the favorable termination of the underlying prosecution.  *Id.* at 2156 (finding

plaintiff "could not bring his fabricated-evidence claim under § 1983 prior to favorable

termination of his prosecution.").  Though the Second Circuit has yet to decide whether a

favorable termination is necessary to sustain a fair trial claim, several recent District

Court decisions have barred such claims on this basis.  *Jamison v. Cavada*, No. 17 Civ.

1764 (LTS) (SDA), 2020 WL 3073234, at *2 (S.D.N.Y. June 10, 2020) (applying

favorable termination requirement to dismiss fair trial claim on summary judgment);

*Daniels v. Taylor*, No. 18 Civ. 3717 (RA), 2020 WL 1165836, at *6 (S.D.N.Y. Mar. 21,

2020) (holding lack of favorable termination precluded fair trial claim following

*McDonough* and applying standard from malicious prosecution cases); *Corso v. Calle-

Palomeque*, No. 17 Civ. 6096 (NRB), 2020 WL 2731969, at *6 (S.D.N.Y. May 26, 2020)

(same).  Assuming favorable termination is required, this Court has already found there is

a genuine issue of fact as to whether his prosecution ended favorably.  *See supra* Part

III.D.i.

Similarly, this Court has rejected the arguments for summary judgment on the element of deprivation of liberty interest. *See supra* Part III.D.ii.

Accordingly, summary judgment on Quiller's fair trial claim is unwarranted.

## IV.    Conclusion

In sum, Quiller's motion for summary judgment is denied in its entirety.  Nunez's motion for summary judgment is denied with respect to the unlawful stop, the unlawful search and the fair trial claims, and granted with respect to the false arrest and malicious prosecution claims.  The parties are directed to participate in a telephonic status conference on September 17, 2020 at 10 a.m.  using the following conference call information: (877) 411-9748; Access Code: 3029857#.  The Court also respectfully directs the Clerk to terminate both motions, Docs. 24 and 29.

SO ORDERED.

Dated:    August 3, 2020
          New York, New York

_____
Edgardo Ramos, U.S.D.J.